**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

EDWARD BURGESS,
                        Plaintiff,

    v.                                  No. 08-CV-725
                                            (GLS/DRH)

GLENN CHAMPAGNE, Facility Health
Service Director; DR. CAHILL, Facility
Director; LOUISE TICHENOR, Dr.; and MR.
BOYEA, Inmate Grievance Program
Supervisor,
                        Defendants.

**APPEARANCES:**                                 **OF COUNSEL:**

EDWARD BURGESS
Plaintiff Pro Se
524 Mellon Street
Pittsburgh, Pennsylvania 15206

HON. ERIC T. SCHNEIDERMAN          MEGAN M. BROWN, ESQ.
Attorney General for the                    Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

   Plaintiff pro se Edward Burgess ("Burgess"), formerly an inmate in the custody of the

New York State Department of Correctional Services ("DOCS"), brings this action pursuant

to 42 U.S.C. § 1983 alleging that defendants, four DOCS employees, violated his

constitutional rights under the Eighth and Fourteenth Amendments.  Am. Compl. (Docket

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

No. 23).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt Nos. 41, 42.  Burgess opposes the motion.  Dkt. No. 47.  For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable to Burgess as the non-moving party.  See subsection II(A) infra.

At all relevant times, Burgess was incarcerated at Franklin ("Franklin") and Upstate ("Upstate") Correctional Facilities.  Am. Compl. ¶¶ 2, 8.  The only remaining contentions are Burgess' Eighth Amendment claim regarding his right to medical treatment related to his back and neck and his Fourteenth Amendment claim alleging that defendant Boyea failed to determine a grievance filed by Burgess.[2]  Dkt. No. 31.

## A. Neck and Back Pain

Burgess underwent a fusion surgery on his neck in 2002.  Dkt. No. 23 at 80.  Burgess was incarcerated at Upstate from June 29, 2006 until September 24, 2007.  Tichenor Decl. (Dkt. No. 41-4) ¶ 6.  During this time, Burgess was under the care of defendant Tichenor, a Physician's Assistant ("PA") who "diagnosed, treated and wrote prescriptions under the

---

[2]DOCS maintains a grievance program for inmate, known as the Inmate Grievance Program (IGP), through which inmates may seek remedies for mistreatment or misconduct by prison staff.  The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the Superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

2

supervision of a physician . . . [and] assess[ed] the physical and psychological status of patients through interviews, health history, physical examination and diagnostic tests." Tichenor Decl. ¶¶ 1, 3.  When Burgess arrived at Upstate in June 2006, he was undergoing a number of treatments for multiple conditions including diabetes and injuries to both his hands and his knee, though he did not express any complaints of neck pain.  Id. ¶¶ 7, 9. Burgess also had made no complaints of neck pain during his previous incarceration at Franklin.  Id. ¶ 8.

On July 26, 2006, Burgess complained of pain in his neck and feet.  Dkt. No. 41-6, Ex. A, p. 165.[3]  Tichenor issued Burgess a three-month prescription for Tylenol, to be taken twice a day.  Id.; see also Tichenor Decl. ¶ 12.  Tichenor prescribed Tylenol, instead of the Naprosyn which Burgess had previously been receiving at Franklin, because "given [Burgess'] status as a diabetic and the potential for it causing renal failure, it was not a proper pain reliever for . . . Burgess."  Id. ¶ 13.  "The Tylenol prescription was renewed as soon as it expired and from reviewing the records it appears that [Burgess] was given a pain reliever prescription the whole time he was at Upstate."  Id.  ¶ 14; see also Dkt. No. 41-6, Ex. A, pp. 26-28, 32, 83, 87, 90, 139, 143-44, 146, 148, 151, 154, 162, 170-72, 361-65, 370, 372, 374, 379, 382, 384-86, 389, 393-94, 401, 415, 422.  Burgess was also being treated for neuropathy as a result of his diabetes, though the prescription that he was given, Neurotin, also acted as a pain reliever.  Tichenor Decl. ¶ 15.  This prescription was also provided for the duration of Burgess' incarceration at Upstate.  Dkt. No. 41-6, Ex. A, pp. 34, 36, 41-44, 46, 50-51.  Tichenor also prescribed another medication for neurogenic pain, but

---

[3] Burgess' complete medical records were filed traditionally with the Court.  See Dkt. No. 41-6, Ex. A.

3

after taking it for a few days Burgess decided he did not like its side effects, so the medication was discontinued. Tichenor Decl. ¶¶ 15-16; Dkt. No. 41-6, Ex. A, pp. 63, 126.

Burgess next began complaining of back and neck pain in January 2007. Tichenor Decl. ¶ 18; Dkt. No. 41-6, Ex. A, p. 363. Burgess was given Extra Strength Tylenol, scheduled for examination, and, despite his complaints of pain, stood in his cell in no obvious or apparent distress. Tichenor Decl. ¶ 18; Dkt. No. 41-6, Ex. A, p. 363. On February 20, 2007, Burgess was seen by a nurse and sought stronger pain medication for his back, feet, hands, and knee. Tichenor Decl. ¶ 21; Dkt. No. 41-6, Ex. A, p. 370. Burgess was bearing his full weight, in no visible distress, and moving all his extremities without any difficulty. Tichenor Decl. ¶ 21; Dkt. No. 41-6, Ex. A, p. 370. When Burgess was offered pain medication, he became upset, refused to discuss the situation further, and walked away from his cell door. Tichenor Decl. ¶ 21; Dkt. No. 41-6, Ex. A, p. 370. A few days later Burgess wrote Tichenor seeking additional pain medication and an x-ray for his neck. Tichenor Decl. ¶ 22; Dkt. No. 41-6, Ex. A, p. 372. Tichenor ordered the x-ray and continued the Tylenol prescription as Naprosyn and Ibuprofen were contraindicated for Burgess based on his diabetes. Tichenor Decl. ¶ 22; Dkt. No. 41-6, Ex. A, p. 372.

The first week in March, Burgess received an x-ray performed on his cervical spine which showed a "fracture of one of the top most screws in the C3 vertebral body [as] compared to the 2003 examination . . . [additionally there were a]dvanced degenerative change[s] . . . seen from C3-C4." Dkt. No. 41-6, Ex. A, p. 358; see also Tichenor Decl. ¶ 23. On March 13, 2007, Tichenor responded to Burgess' claims that the screws used in the operation were fractured, seeking information as to the details surrounding the surgery. Tichenor Decl. ¶ 24; Dkt. No. 41-6, Ex. A, p. 355; Am. Compl. ¶ 26; Dkt. No. 23 at 79.

Within a week, they determined that Burgess' surgery occurred in August 2002, the x-rays showed the possible fracture of two screws, and a neurosurgery consultation was required. Tichenor Decl. ¶ 25; Dkt. No. 41-6, Ex. A, p. 309.  The neurosurgery consultation was approved on April 5, 2007.  Tichenor Decl. ¶ 26.[4]

On March 27, 2007, Burgess complained of pain in his neck, but medical records indicate that his range of motion was good and there was no swelling noted.  Dkt. No. 41-6, Ex. A, p. 380.  Burgess was given Tylenol and a warm compress to place on his neck.  Id. On March 29, 2007, a nurse visited Burgess to advise that taking too much Tylenol was harmful to his health, as Burgess was running out of his prescription medication and requesting refills prior to the appropriate date.  Id., pp. 90, 380; see also Tichenor Decl. ¶ 17 (explaining that Burgess "was not always compliant with his treatment . . . .").  On April 9 and 30, 2007, Burgess was informed that his neurosurgery consultation was pending scheduling by the Central Office Medical Unit.  Dkt. No. 41-6, Ex. A, p. 95, 378, 383; Dkt. No. 23 at 83.

On May 14, 2007, a DOCS supervisor advised Burgess that he had relayed Burgess' complaints of pain and leaned that Burgess was scheduled to meet with a neurosurgeon concerning the pain in relation to the surgery.  Dkt. No. 23 at 38, 77.  Additionally, the letter informed Burgess that such scheduling was done by CORC and should be forthcoming soon.  Id.  On May 31, 2007, a memorandum was sent from an Upstate corrections official

---

[4] Once Tichenor requested the neurology consultation, she was no longer involved with the decision-making process.  Tichenor Decl. ¶ 27.  Instead, the consultation required approval from DOCS headquarters in Albany and then needed to be scheduled by the Central Office Medical Unit.  Id.  "It was not unusual for a neurosurgery consultation appoint[ment] to take three months to schedule."  Id. ¶ 28.

to an official at the Coxsackie Regional Medical Unit ("RMU") explaining that Burgess was scheduled to report to Coxsackie on June 11th for a June 14th neurosurgery consultation and also provided the RMU staff with a list of medications Burgess would require upon his arrival and temporary stay at the RMU. Dkt. No. 41-6, Ex. A, p. 97. The date of the consultation was apparently changed, and a similar memorandum was again sent on June 15th, indicating that Burgess would arrive at the RMU on July 11th for a neurosurgery consultation on the following day. Id., p. 101. The memorandum again included a list of medications Burgess would require, including his pain medication. Id.

On July 9, 2007, medical records indicate that Burgess refused to go on the neurology consultation at the RMU because he was not provided with enough self-carry medication to sustain him through his absence from Upstate. Dkt. No. 41-6, Ex. A, p. 403; see also Id., p. 109; Tichenor Decl. ¶ 29. Burgess was informed that the receiving facility, the RMU, would be apprised of the medication that he required upon his arrival, but Burgess still refused to go. Dkt. No. 41-6, Ex. A, pp. 109, 403; Tichenor Decl. ¶ 29. On June 11, 2007, Burgess asserted in a grievance appeal that his appointment with a neurologist was cancelled after he suffered through a seven-hour bus ride without pain or diabetes medication. Dkt. No. 23 at 91.

On July 24, 2007, Tichenor received a letter from Burgess accusing her of stopping Burgess' pain medication and causing him increased suffering. Tichenor Decl. ¶ 30; Dkt. No. 41-6, Ex. A, p. 400. Tichenor responded by referring Burgess to his medical records which indicated that a prescription for Tylenol renewal was written on July 13. Tichenor Decl. ¶ 30; Dkt. No. 41-6, Ex. A, pp. 110, 400, 402. A few days later, Burgess again sought different pain medication, stating that he did not want to speak to a PA but only to a

6

physician, and again appearing in no acute distress since he was successfully moving his head, neck and upper extremities without any difficulty or pain. Dkt. No. 41-6, Ex. A, p. 413. Burgess was informed that he was required to discuss his treatment with a PA and was offered pain medication. Id. Burgess responded that he was being denied medical care and then walked away from his cell door, refusing the pain medication which had previously been offered. Id.

On August 1, 2007, Burgess again consulted with Tichenor, stating that he still wished to attend a neurology consultation but he was worried about the amount of self-carry medication he received. Tichenor Decl. ¶ 31; Dkt. No. 23 at 80; Dkt. No. 41-6, Ex. A, p 320, 333. Tichenor submitted another consultation request on Burgess' behalf. Tichenor Decl. ¶ 32; Dkt. No. 23 at 80; Dkt. No. 41-6, Ex. A, p 312, 320, 333. Another memorandum was sent to the RMU identifying the medication which Burgess would require during his consultation stay and Burgess was seen for the consultation on September 13, 2007. Tichenor Decl. ¶¶ 33-34; Dkt. No. 41-6, Ex. A, p. 115; Dkt. No. 23 at 80. The physician increased Burgess' Neurotin prescription and advised him to reschedule with his surgeon if the additional medication did not help. Tichenor Decl. ¶ 34; Dkt. No. 23 at 80. Burgess left Upstate on September 24, 2007 and eventually arrived at Clinton Correctional Facility where the physician's orders increasing his Neurotin were received and implemented on September 28, 2007. Tichenor Decl. ¶ 35; Dkt. No. 41-6, Ex. A, pp. 426-27.

Subsequently, Burgess continued to receive treatment for chronic pain and the fractured screws in his neck. On January 28, 2008, CT scan results showed a disruption of a screw and spinal stenosis in three vertebrae. Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334. Burgess continued to complain of pain despite the multiple prescriptions and was advised to

7

see Dr. DiRisio, who had performed the original surgery.  Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334.  On April 10, 2008, Burgess returned for another consultation for his persistent neck pain.  Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334.  Burgess was still not responding to the pain medication and no neurological findings were noted.  Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334.  Burgess was again instructed to return to Dr. DiRisio to see if screw removal was necessary or if the pain was unrelated to the screw breakage.  Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334; Tichenor Decl. ¶ 36.  Additional radiology tests were suggested.  Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334.

**B. Grievances**

Prior to Burgess' incarceration at Upstate, he filed a grievance concerning events at Franklin.  Am. Compl. ¶ 17.  The grievance was denied and appealed.  Id.  After August 4, 2006, defendant Boyea, the IGP Supervisor, wrote to Burgess regarding the previously filed grievance at Franklin, explaining that a CORC decision had not yet been rendered.  Docket No. 23 at 70; Am. Compl. ¶ 18.  On September 18, 2006, DOCS employee Eagen wrote to Burgess stating that  Burgess' grievance was received by CORC on August 7 and was being processed.  Dkt. No. 23 at 71.  Burgess wrote Eagen on December 10, 2006, inquiring whether CORC had responded to his appeal yet.  Am. Compl. ¶ 20.  Burgess received a response that CORC had issued is decision on September 27, 2006 and that if he had not received a copy, he should contact the IGP Supervisor at Franklin.  Id.

## II.  Discussion

In his amended complaint, Burgess claims that defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs and his Fourteenth Amendment rights by failing to send him the September 27, 2006 CORC decision.  Defendants move for summary judgment asserting that (1) Burgess has failed to establish that defendants Champagne, Cahill, and Boyea were personally involved in his Eighth Amendment claims; (2) Burgess' constitutional claims are meritless; and (3) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### B. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;

10

>	(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
>	(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
>	(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
>	(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

### 1. Champagne and Cahill

Defendants Champagne and Cahill were directly involved with the diagnosis and treatment of Burgess' broken finger while he was incarcerated at Franklin. Am. Compl. ¶¶ 3-6. The medical evidence presented regarding the treatment of Burgess' neck and back pain occurred after his transfer from Franklin and during his incarceration at Upstate. Champagne and Cahill were never mentioned in the treatment of this particular ailment. As Burgess' prior Eighth Amendment claims related to his broken finger were dismissed pursuant to the prior Decision and Order (Dkt. No. 31 at 15-17), the only involvement relevant to the progression of the case is that regarding the treatment of Burgess' neck pain. As defendants Champagne and Cahill were not involved with this portion of Burgess' treatment, they were not personally involved in his care. Moreover, there is nothing in the amended complaint to indicate that Champagne and Cahill failed to train any of the

defendants, were grossly negligent, or were privy to a continuing pattern of constitution violations.

Accordingly, defendants' motion should be granted on this ground as to Champagne and Cahill.

### 2. Boyea

Defendant Boyea allegedly failed to respond to Burgess' request for a previously filed grievance at Franklin. Because Boyea was not involved with any of the remaining Eighth Amendment claims, his lack of personal involvement with respect to the medical claims is clear. However, Burgess has offered evidence that Boyea was directly involved in the alleged depravation of Burgess' due process rights as discussed in subsection II(D) infra. Accordingly, a question of fact exists whether Boyea was personally involved in the deprivation of Buregess' due process rights and defendants' motion on this ground should be denied as to that claim against Boyea.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge

of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St.

Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Defendants assume, though do not admit, that Burgess' neck and back condition were sufficient to constitute a serious medical need but argue that there was no deliberate indifference to Burgess' medical treatment as required for a constitutional violation. Defs. Mem. of Law (Dkt. No. 42) at 6. Even construing the facts in the light most favorable to Burgess, Burgess has failed to establish a question of material fact sufficient to indicate that Tichenor was deliberately indifferent to his care.

Upon arrival at Upstate, Tichenor reviewed Burgess' medical records and began treating his myriad of physical conditions. Tichenor Decl. ¶¶ 7, 9. It was not until July 2006 that Burgess began complaining about chronic pain in his neck, but when that occurred, Tichenor immediately prescribed pain medication to attempt to alleviate Burgess' symptoms. Id. ¶¶ 12, 14. Moreover, Tichenor modified the type of pain medication, prescribing one that was less harmful to Burgess' continued health given his various other conditions.[5] Id. ¶ 13. This medication was also consistently refilled and provided to Burgess throughout his incarceration at Upstate. Id ¶ 14; see also Dkt. No. 41-6, Ex. A, pp. 26-28, 32, 34, 36, 41-44, 46, 50-51, 83, 87, 90, 139, 143-44, 146, 148, 151, 154, 162, 170-72, 361-65, 370, 372, 374, 379, 382, 384-86, 389, 393-94, 401, 415, 422. These actions refute any allegations of delay or indifference to treatment of Burgess' symptoms.

Additionally, any delay in receiving pain medication or treatment was attributable to Burgess' own actions. On several occasions, Burgess complained of pain, being seen by

---

[5] The prior Decision and Order determined that, to the extent a claim was proffered, any disagreement over the pain medication prescribed to Burgess was insufficient to establish an Eighth Amendment violation. Dkt. No. 31-1 at 17 n.10.

medical staff rather than a physician, and offered a plan or medication with which he did not agree. On those occasions, Burgess responded by walking away from medical staff effectively terminating the appointment. Dkt. No. 41-6, Ex. A, pp. 363, 370, 380, 413; Tichenor Decl. ¶ 17. Burgess' voluntary actions in walking away were the direct and proximate cause of him not receiving further medication or treatment. Such actions cannot be attributed to the medical staff or Tichenor.

Furthermore, Tichenor was not responsible for any alleged delay in Burgess attending his neurosurgery consultation. As soon as Tichenor was notified, Tichenor complied with Burgess' requests for radiology tests and a specialty consultation. Tichenor Decl. ¶¶ 22, 25. There is no evidence the delay at DOCS headquarters in approving and then scheduling that consultation was due to any indifference or delay on Tichenor's part. See note 5 supra. Furthermore, any alleged delay in the three months it took to schedule the delay is incredible as that is a reasonable time frame for any individual patient seeking specialty medical services. Also, Tichenor and the medical staff provided all the necessary information regarding Burgess' required medications to the medical staff at the RMU. Id. ¶¶ 33-34; Dkt. No. 41-6, Ex. A, pp. 97, 101, 115.

Burgess was apprised of this fact when he expressed concern over his lack of self-carry medication and still chose not to attend the consultation trip. Tichenor Decl. ¶ 29; Dkt. No. 41-6, Ex. A, pp. 109, 403. Burgess' inability to physically possess the medications during transport does not indicate that the respective facilities would not provide him with the appropriate doseage prior to, and upon arrival at, the RMU. Furthermore, any failure on the part of the RMU staff to provide such medication would not have been attributable to either Upstate or Tichenor, as Upstate had provided all the relevant information to the RMU as

evidenced by the memorandum which the RMU received and were incorporated into Burgess' medical records. While it was initially unclear whether Burgess attended the consultation, based on his statement of appeal on his grievance (Dkt. No. 23 at 91), the medical records make it clear that Burgess did not ride in a car for seven hours without pain medication and instead chose to forego participating in the trip altogether. Burgess' ultimate decision to refuse the trip was his choice and there is no evidence that ir resulted from any delay by the medical staff.

Lastly, the ultimate result appears to be that Burgess still suffers from chronic pain in his neck and that this pain may not be responding to any medication. Dkt. No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334. This amounts to an unfortunate bad result. While unfortunate, this is insufficient by itself to state a claim for deliberate indifference as it does not indicate a failure or denial of treatment. The record indicates without question that Burgess received at least adequate care. See Dean, 804 F.2d at 215 (citations omitted). Accordingly, defendants motion as to this claim should be granted.

### D. Due Process

An action commenced pursuant to § 1983 requires proof of the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981).

"Prisoners, including pretrial detainees, have a constitutional right of access to the

16

courts . . . ." Bourden v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004) (internal quotation marks omitted) (citing Bounds v. Smith, 430 U.S. 817, 821-22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts). "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." Shell v. Brzezniak, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) (citations omitted). However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." Shell, 365 F. Supp. 2d at 370 (citations omitted).

In this case, Burgess claims that his due process rights were violated when he did not receive a response from Boyea. This appears to be nothing more than a complaint about Boyea's failure to follow established DOCS policies and provisions, which is not actionable in federal court. See Bolden v. Alston, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would create liability under state law . . . ."). Thus Burgess has failed to establish that he had a liberty interest which required constitutional protection. Moreover, it is unclear to what this particular grievance was even in reference. Assuming that the underlying facts of the grievance concerned deprivations under other constitutional provisions, such as delay of and indifference to medical care, the substance of Burgess' grievance is addressed supra or has already been dismissed by the prior Decision and Order.

Accordingly, defendants' motion as to this claim should also be granted.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights." Smith v. City of Albany, No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. For the reasons discussed above, Burgess has failed to demonstrate any constitutional violation. Accordingly, it is recommended in the alternative that defendants' motion on this ground also be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for

18

summary judgment (Docket No.41) be **GRANTED** in all respects as to all remaining claims and defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 12, 2011
       Albany, New York

_David R. Homer_
United States Magistrate Judge